

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **PLEAS J. SMITH,** | ) |
| | ) |
| Plaintiff, | ) Case No. 06 C 4250 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Martin C. Ashman |
| **VILLAGE OF NORRIDGE**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Pleas J. Smith ("Smith"), filed suit against The Village of Norridge, Illinois

("Norridge"), several Norridge police officers ("the individual officers"), and Norridge Police

Chief Charles Ghiloni ("Ghiloni"), as well as the owners of the Harlem Irving Plaza shopping

mall ("Harlem Irving"), a store in the mall ("Intrigue Jewelers"), and several mall security guards

employed by Harlem Irving ("the security guards"). Smith's claims arise out of an altercation that

took place at Harlem Irving Plaza on September 17, 2005. Smith asserts various state-law tort

claims and alleges that he was deprived of his constitutional rights under the Fourth and

Fourteenth Amendments in violation of 42 U.S.C. § 1983. On February 6, 2008, all parties

agreed to have this Court conduct any and all proceedings in the case, including entry of final

judgment, pursuant to Local Rule 73.1. On October 2, 2008, Harlem Irving and the security

guards were dismissed from the case pursuant to a negotiated settlement with Smith. Currently

before the Court is a motion by Norridge, Ghiloni, and the individual Norridge officers ("the

Movants") for summary judgment on all counts. For the reasons set forth below, the motion for

summary judgment is granted.

# I. **Background**

The facts recited here are undisputed and are drawn from the Movants' Local Rule 56.1(a)(3) statement of undisputed material facts, Smith's Local Rule 56.1(b)(3)(c) statement of additional facts, and the responses to those factual submissions. Where applicable, the Court will identify factual disputes between the parties.

Pleas Smith was born on June 9, 1927, and was seventy-eight years old at the time of the incident that forms the basis of this case. (Pl.'s Stmt. of Add'l Facts, ¶ 1.) On September 17, 2005, Smith went to Intrigue Jewelers, a jewelry store located in the Harlem Irving Plaza mall, in order to purchase a ring. (Defs.' Stmt. of Facts, ¶ 16.) Smith arrived at the store at about 11:30 a.m. (*Id.*) He selected a ring and asked to have it sized. (*Id.*) Smith told the clerk at the store that the ring had to be ready by 5:00 p.m. (*Id.*) When Smith returned at 5:00, the ring was not ready. (*Id.*, ¶ 17.) The Movants claim that the ticket for Smith's ring said "5:30" (Defs.' Stmt. of Facts, ¶ 21.), while Smith argues that the clerk at Intrigue wrote "5:30" on the ticket only after Smith arrived at the store to pick up the ring. (Pl.'s Resp. to Def.'s Stmt. of Facts, ¶ 21.) In any event Smith was upset, and when the ring was still not ready at 5:10, he told the clerk that he wanted to cancel his purchase. (Defs.' Stmt. of Facts, ¶ 17.) The sales clerk refused to cancel the purchase. (*Id.*)

The Intrigue clerk called mall security as a result of his dispute with Smith. (Defs.' Stmt. of Facts, ¶ 17.) Mall security officers Ralph Bonifazi and Tom Surma were the first to respond to the call from Intrigue. (*Id.*, ¶ 19.) According to Bonifazi, he, Surma, Smith, and several Intrigue employees were present at the store. (*Id.*) Bonifazi discussed the situation with Smith. (*Id.*, ¶ 20.) Bonifazi testified that the ticket stub said "5:30," and that he tried to explain to Smith

that he was early. (*Id.*, ¶ 21.) According to Bonifazi, Smith began to yell and demand his money back, attracting a crowd of onlookers. (*Id.*, ¶ 22.) Smith denies raising his voice or attracting a crowd. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 22.) However, Bonifazi's testimony is corroborated by a third security officer, Tom Morales, who arrived after Bonifazi and Surma and heard Smith yelling, and by a security supervisor, Robert Simpson, who described Smith as "highly agitated." (Defs.' Stmt. of Facts, ¶¶ 24, 25.) It is undisputed that Bonifazi instructed Smith to leave the mall. (*Id.*, ¶ 23.) The Movants assert that Smith refused to leave the mall, while Smith states that he agreed to leave "as soon as the matter was straightened out." (*Id.*; Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 23.)

Simpson, the security supervisor, arrived on the scene about five minutes after being dispatched.[1] (Defs.' Stmt. of Facts, ¶ 25.) When he arrived, Bonifazi and Surma were already interacting with Smith. (*Id.*) Simpson instructed the officers to handcuff Smith and escort him out of the mall.[2] (*Id.*, ¶ 26.) Smith was handcuffed by either Bonifazi or Surma. (*Id.*) Bonifazi,

---

[1] It is unclear whether Simpson was "dispatched" at the same time as Bonifazi and Surma or whether he responded to a second, later, call.

[2] Smith responds to this factual assertion with a rambling, one and one-half page response that is mainly relevant to the issue of when and where the Harlem Irving security officers handed Smith over to the Norridge Police. Therefore, it is not responsive to this particular assertion of fact. Smith uses the same omnibus objection to respond to Statements of Fact 27, 28, 29, 31, 32, 33, 44, 47, 48, and 54. This is unacceptable. The Movants, in accordance with Local Rule 56.1, have gone to the trouble of breaking the material facts of the case down into particularized, specific factual assertions and listing them in numbered paragraphs. The purpose of requiring such a statement of facts is to isolate the material facts and determine which, if any, are truly in dispute. This purpose is severely undermined by Smith's refusal to address the merits of each factual assertion. Smith's consolidated response, reiterated without regard to its applicability to the specific assertion allegedly being disputed, does not serve him well, as it makes it more difficult for the Court to perform its duty of determining whether there truly are disputed issues of material fact that would preclude summary judgment. (continued...)

- 3 -

Surma, Simpson, and Morales escorted Smith away from Intrigue Jewelers toward a mall exit. (*Id.*, ¶ 27.) According to Morales, either Bonifazi, Surma, or both were touching Smith's arm when he was escorted from the mall. (*Id.*)

At this point, the factual record becomes somewhat murky. It is undisputed that Sgt. Pekar of the Norridge Police Department arrived at the mall after receiving a request for assistance from the mall security department. (*Id.*, ¶ 30.) Mall Security Supervisor Simpson testified that Pekar met the mall security officers near the food court and that Smith was handed over to the Norridge Police inside the mall "by the newsstand." (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 27.) Pekar testified that he was entering the mall when he saw the security officers bringing Smith towards the door, and that he held the door open while the mall security officers brought Smith outside. (Defs.' Stmt. of Facts, ¶ 31.) Presenting a third point of view, Bonifazi testified that Pekar was inside the mall, but Smith was transferred to the Norridge Police "at" the mall doors. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 27; Bonifazi Dep. at 90:13-16 ("Q: If you were to pick a spot where the transfer occurred, would it be at the food court, at Door G, or outside? A: I would say at Door G.")).

---

²(...continued)
The Court would be within its discretion to simply disregard Smith's responses for failure to comply with the requirements of Local Rule 56.1. *See Wormely v. Ponce*, No. 06 C 2965, 2007 WL 4162810, at *1 (N.D. Ill. Nov. 19, 2007). However, in the interest of adjudicating the case on its merits, the Court will attempt to discern which factual issues are actually in dispute.

Norridge Police Officer Terry Urey was also dispatched to the scene.[3] (Defs.' Stmt. of Facts, ¶ 39.) Urey parked his squad car outside of Door G, which leads to the food court. (Id., ¶ 43.) Urey testified that as he was pulling up to Door G, he saw mall security guards escorting Smith from the mall with Pekar holding the door open. (Id., ¶ 44.) According to Urey, mall security officers transferred Smith to Pekar, and Pekar placed Smith in Urey's squad car. (Id., ¶¶ 47-48) This is consistent with Pekar's own testimony. Pekar Dep. at 53-55. Bonifazi testified that it was Urey who met him at Door G and escorted Smith to his vehicle. Bonifazi Dep. at 92:5-10, 94:16-24. Further muddying the picture, Morales testified that the escort to Urey's car was done entirely by mall security personnel. (Defs.' Stmt. of Facts, ¶ 48.)

Once Smith was in the squad car, Urey spoke with mall security officers in order to ascertain what had happened. (Defs.' Stmt. of Facts, ¶ 49.) Morales, the security guard, told him that Smith was involved in a verbal dispute at Intrigue Jewelers, that he had become irate, and that he was verbally abusive to store personnel and the mall security officers who arrived at the scene. (Id., ¶ 50.) Urey did not interview Smith regarding what had happened at the mall. (Pl.'s Resp. to Defs.' Stmt. of Fact, ¶ 51.) While Urey and Morales were talking, Smith complained to

---

[3] Smith contends that a third officer, Victor Wendt, was dispatched to the mall. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 39.) However, Urey testified that he did not believe Wendt was ever at the scene, Pekar testified that he called Wendt off before he ever arrived because the situation was under control, and Surma testified that he never saw Wendt. (Defs.' Stmt. of Facts, ¶¶ 39-41.) Smith's assertion that Wendt was "involved" in his arrest is based on the fact that Wendt is also a Harlem Irving security guard and Simpson's testimony that he asked Wendt for help in getting information about Smith from the Norridge Police. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 39.) However, Simpson's testimony clearly shows that he asked Wendt for help only after his own officers "went to the station" but "weren't given the information right away because they [the Norridge Police] were processing [Smith] . . . at the time." Simpson Dep. at 72:10-13. This testimony shows that Wendt's involvement came after the arrest, when Smith had already been taken to the police station.

Pekar that his cuffs were too tight, and Pekar loosened them. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 53; Pekar Dep. at 53:1-10.) Urey then drove Smith to the Norridge Police Department. (Defs.' Stmt. of Facts, ¶ 52.) The trip to the station, which is approximately two blocks from the mall, took about five minutes. (Id.) During the drive to the station, Smith complained again that his cuffs were hurting him. (Id., ¶ 53.) Urey told him that his cuffs would be removed at the station, and they were in fact removed once Smith was in the police station lockup. (Id.)

While he was being placed into Urey's squad car, Smith complained that he did not feel well and stated that he wanted to go to the hospital. (Pl.'s Stmt. of Add'l Facts, ¶ 10.) Urey asked Pekar what he should do; Pekar instructed Urey to take Smith to the Norridge Police Station. (Id.) Smith alleges that unspecified Norridge officers threatened him with twenty-four hours in jail if he continued to request medical attention. (Id., ¶ 9.) However, when Urey and Smith arrived at the police station several minutes later, Urey called for paramedics, who arrived shortly. (Defs.' Resp. to Pl.'s Stmt. of Add'l Facts, ¶ 9.) According to Urey and the paramedics' report, which Smith signed, Smith denied having any shortness of breath or chest pains, refused all treatment, and stated that he only wanted to have the paramedics document a contusion on his arm. (Id., ¶ 9; Defs.' Reply in Supp. of Summ. J., Ex. A.) The paramedics noted a small contusion on Smith' left arm as well as "neurodeficits," but did not observe any other symptoms. (Defs.' Reply in Supp. of Summ. J., Ex. A.) Smith claims that he refused treatment because of the officers' threat that he would have to remain in custody for twenty-four hours if he requested medical treatment. (Pl.'s Stmt. of Add'l Facts, ¶ 9.) It is unclear exactly how long Smith remained at the police station, but he reported to Resurrection Medical Center at 9:37 on the evening of the 17th. (Pl.'s Stmt. of Add'l Facts, ¶ 21, Ex. 18.) According to his hospital records,

Smith was treated for wrist abrasions and shoulder and back pain. (*Id.*) The hospital report notes that Smith told the nurse "I got arrested" but declined to elaborate on his condition. (*Id.*)

As a result of the incident at the mall, Smith was charged with a misdemeanor violation of a Norridge village ordinance prohibiting "disorderly conduct." (Urey Dep. at 33:18-34:17; Pl.'s Stmt. of Add'l Facts, Ex. 14.) The charge was dismissed at a hearing on November 3, 2005. (Pl.'s Stmt. of Add'l Facts, ¶ 14.) Within a few days of the incident, Smith and his daughter met with Norridge Police officials to complain that Norridge officers used excessive force during the September 17, 2005, incident. (Pl.'s Stmt. of Add'l Facts, ¶ 35.) Smith's claims of excessive force are based on two discrete actions. The first is the officers' alleged refusal to loosen his handcuffs, discussed above. Smith also alleges that, while he was being escorted from the mall in handcuffs, his wrists were bent back towards his body (the Court will follow the parties in referring to this maneuver as a "wrist lock").

Smith filed suit on August 7, 2006, against Intrigue Jewelers, Harlem Irving, the mall security guards, The Village of Norridge, Chief Ghiloni, and the individual Norridge Police officers. In addition to state-law tort claims for assault and battery, false arrest, false imprisonment, and intentional infliction of emotional distress, Smith alleged that the individual officers deprived him of his constitutional rights under color of state law in violation of 42 U.S.C. § 1983. Smith claimed that The Village of Norridge was liable for the deprivation of his constitutional rights because his rights were violated as a result of official municipal policies. He also accused all of the Defendants of participating in a conspiracy to violate his constitutional rights. Smith subsequently settled with Harlem Irving and the mall security guards and dismissed them from the case. After the instant motion was filed, Smith voluntarily dismissed all

of his claims against Norridge Police Officer Victor Wendt as well as his conspiracy claim against all remaining Defendants. (Pl.'s Resp. at 4-5.) The Court now considers the remaining Defendants' (The Village of Norridge, Chief Ghiloni, and Officers Urey and Pekar) motion for summary judgment with respect to the remaining claims.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court views all facts in the light most favorable to Smith and draws all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255. Not all factual disputes will preclude summary judgment; rather, a genuine issue of material fact will exist only where there is evidence such that a jury "could reasonably find for the [nonmoving party]." *Id.*
The parties may not rely on mere allegations or speculation in arguing for or against summary judgment. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008). At the summary judgment stage, both sides must support their factual assertions with "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

## B.    Smith's Section 1983 Claims

Originally enacted as part of the Civil Rights Act of 1871, the statute now codified as

42 U.S.C. § 1983 ("Section 1983") provides a cause of action against those who act "under color

of" state law to deprive another of his or her constitutional rights. *See* 42 U.S.C. § 1983.

Although the statute was initially confined to actions actually authorized by state law, Section

1983's requirement of action "under color of state law" has long been held to include the

"[m]isuse of power [] possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." *Monroe v. Pape*, 365 U.S. 167, 184

(1961) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). In general, a plaintiff must

show that the defendant personally participated in a deprivation of constitutional rights; a

supervisor is not liable for the actions of her subordinates unless she is "personally involved"

because she knows of the subordinates' conduct and approves of, condones, or facilitates it. *See*

*Chavez v. Illinois State Police*, 251 F.3d 612, 651 (2001). Similarly, a municipality is not

vicariously liable for its employees' actions, but may be liable if (1) it has adopted "an express

policy that, when enforced, causes a constitutional deprivation"; or (2) "the constitutional injury

was caused by a person with final policymaking authority." *Montaño v. City of Chicago*, 535

F.3d 558, 570 (7th Cir. 2008).

The foundation for any Section 1983 claim is, of course, the deprivation of a

constitutional right. In his amended complaint, Smith alleges that he was arrested without

probable cause (in violation of the Fourth Amendment to the United States Constitution,

applicable to the states through the Fourteenth Amendment) and subjected to excessive force at

the time of his arrest (also in violation of the Fourth Amendment). (*See* Amended Compl.,

Dkt. # 31.) Smith's attorneys have also alleged, in their oral arguments and in briefs before the Court, that Norridge Police officers indirectly denied Smith access to medical care by threatening to hold him in custody for twenty-four hours if he sought medical treatment. (*See* Pl.'s Resp. at 2; Pl.'s Stmt. of Add'l Facts, ¶ 9.) Smith argues that this denial of care violated his constitutional rights, though he is vague as to the specific constitutional basis for this claim (perhaps understandably so, as the discussion in Section II.B.3 will show).

### 1. Arrest Without Probable Case/Malicious Prosecution

Smith contends that the Defendants violated his Fourth Amendment right to be free from unreasonable search and seizure because they arrested him at the Harlem-Irving Plaza shopping center without probable cause. "Probable cause exists where an officer reasonably believes, in light of the facts and circumstances known to the officer at the time of the arrest, that the suspect had committed or was committing an offense." *Shipman v. Hamilton*, 520 F.3d 775, 778 (7th Cir. 2008). The probable cause standard is an objective one that focuses on the facts as they would appear to a reasonable officer; an objectively reasonable belief that an offense was committed is sufficient, even if that belief is later found to be incorrect. *See Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003). Smith was charged with violating a local disorderly conduct ordinance. In their brief, the Defendants suggest that probable cause also existed to arrest Smith for violating the Illinois disorderly conduct statute, 720 ILCS 5/26/1(a)(1). (*See* Def.'s Br. at 7.) Both laws provide substantially the same definition of disorderly conduct. Therefore, the critical question is whether the officers had probable cause to arrest Smith because they reasonably

believed, in light of the facts and circumstances they knew of at the time of his arrest, that he had committed the offense of disorderly conduct.

The wording of the Norridge ordinance under which Smith was charged is broad: "A person commits the offense of disorderly conduct when he or she knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." (Pl.'s Stmt. of Add'l Facts, Ex. 15 ("Village of Norridge Code of Ordinances, Sec. 62-146").) Again, the focus of the probable cause inquiry is on whether the arresting officers reasonably believed, based on the facts and circumstances they were presented with, that Smith had committed this offense. It is undisputed that Tom Morales, one of the mall security officers who responded to the call from Intrigue Jewelers, told Officer Urey that he had observed Smith creating a disturbance in the mall, becoming irate at the jewelry store staff, yelling, and verbally abusing the staff and security officers. (Def.'s Stmt. of Facts, ¶¶ 49-50.) Under the circumstances, it was reasonable for Officer Urey to believe that Morales was a credible witness who had observed Smith's behavior. It was reasonable for Urey to conclude that the conduct described by Morales constituted "unreasonable" action that would "alarm or disturb" others, meeting the definition of "disorderly conduct" contained in both the Norridge ordinance and the Illinois statute. Therefore, probable cause existed for the arrest.

Smith's arguments to the contrary are misguided. He devotes an inordinate amount of space in his brief to establishing the proposition that arguing with a police officer is insufficient on its own to support a charge of disorderly conduct. (*See* Pl.'s Resp. at 6-7.) But Smith was not arrested for "arguing with a police officer"; he was arrested for becoming irate in a place of business, verbally haranguing the business's employees and the mall's security staff, and refusing

to leave. It is easy to understand how this alleged conduct would alarm or disturb others in the area and interrupt the ordinary course of business within the shopping mall. Therefore, the analogy to cases where individuals have been arrested merely for arguing with police is inapt.

Smith also argues that probable cause did not exist because he was not actually doing the things—yelling, cursing, etc.—that Morales told Officer Urey he was doing. According to Smith, this is an issue of fact that should preclude summary judgment. However, as discussed above, the probable cause inquiry does not depend on whether the arrestee is ultimately guilty of the offense for which he is arrested; all that is required is a reasonable belief that an offense has been committed. *Shipman*, 520 F.3d at 778. "In making a decision to arrest someone for criminal conduct that he did not witness, a police officer may rely on information provided to him by . . . an eyewitness to the crime that the officer reasonably believes is telling the truth." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007). Once a "credible witness" (like the security guard) informed Officer Urey that Smith had engaged in conduct that constituted a crime, Urey had probable cause to make the arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006). With probable cause established, Officer Urey had "no duty to investigate extenuating circumstances or search for exculpatory evidence." *Id.* Therefore, the undisputed facts show that the arresting officers had probable cause to believe that Smith had committed the offense of disorderly conduct, and the Defendants are entitled to summary judgment on Smith's Section 1983 claim for unreasonable arrest.

To the extent that Smith alleges that the issuance of a local ordinance violation constituted malicious prosecution, this claim also fails. In order to prevail on a claim of malicious prosecution under Section 1983, Smith must be able to establish the elements of

malicious prosecution under the relevant state law (in this case, the law of Illinois). *See Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir. 1998). Under Illinois law, a claim of malicious prosecution requires a showing that the defendant initiated a criminal proceeding without probable cause. *See Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997). Because the Court has found that there is no genuine issue of material fact regarding the existence of probable cause to believe that Smith committed the offense of disorderly conduct, Smith's claim for malicious prosecution must fail.

### 2. Excessive Force

Smith alleges that Officers Urey and Pekar used excessive force during and after his arrest in violation of the Fourth Amendment's prohibition of unreasonable seizures. The factual basis for this claim is difficult to pin down based on Smith's brief. At certain points—as when Smith argues that "Defendants fail to cite to any compelling government interest is at stake [sic]" because the disorderly conduct violation was "minor" (Pl.'s Br. at 10.)—Smith's position seems to be that the entire arrest was unnecessary and therefore excessive. However, the Court has already found that the officers had probable cause to arrest Smith, so any claim of excessive force must be based on something beyond the mere fact that he was arrested. The initial application of the handcuffs can also be ruled out as a basis for Smith's excessive force claim against the remaining Defendants because it is undisputed that Smith was handcuffed by mall security guards (who were dismissed pursuant to a settlement) prior to the arrival of the Norridge Police officers. (Defs.' Stmt. of Facts, ¶ 26.) Therefore, any claim of excessive force must be based on conduct that occurred while Smith was being transported from Intrigue Jewelers to the Norridge

Police vehicle; while he was being driven from the mall to the station; or while Smith was in custody at the station.

Smith first argues that he was subjected to excessive force in the form of a "wrist lock" (a maneuver in which the wrists are bent back toward the body while the subject is handcuffed) while he was being escorted away from Intrigue Jewelers. Smith cannot identify the individual that applied this allegedly excessive force but argues that this uncertainty creates an issue of fact that precludes summary judgment. The Court disagrees. It is true that not all of the circumstances surrounding Smith's arrest and transfer to Norridge Police custody are clear: Smith cannot identify the specific individuals involved and complains that, contrary to department policy, the Norridge police officers at the scene refused to identify themselves. Furthermore, as discussed in Section I above, the police officers and mall security guards have offered different descriptions of the transfer of custody, including where it took place (inside or outside of the mall) and who took custody of Smith from the mall security guards (Officer Pekar or Officer Urey). However, it is undisputed that Smith was originally handcuffed inside the mall in the vicinity of Intrigue Jewelers by mall security guards, and that these guards began escorting him out of the mall. (Defs.' Stmt. of Facts, ¶¶ 25-27.)

While there is some uncertainty as to where Smith was handed over to the Norridge Police and which officer took custody, in every version of the events there is only one transfer: the individuals who arrested Smith and began escorting him out of the mall had control over him first and then transferred him to the Norridge Police. This is crucial because Smith, despite his uncertainty about the identity and affiliation of the various people involved in his arrest, testified that the person who applied the wrist lock handed him over to a Norridge police officer, who

- 14 -

then placed him in a car and took him to the station. (Defs.' Stmt. of Facts, ¶ 34; Smith Dep. at 29:24-30:8.) Therefore, there is no question that the alleged wrist lock took place before custody was transferred to the Norridge Police. Smith also testified that the person who applied the wrist lock was the same person who escorted him out of the mall, and that the person who escorted him out of the mall was one of the three or four individuals who were surrounding him when he was originally handcuffed. (Smith Dep. at 28:3-15.) Given the undisputed fact that it was the mall security guards who initially handcuffed Smith and escorted him prior to the transfer of custody, it is clear that the wrist lock could not have been applied by any of the Defendants who remain in this case. Smith may harbor a subjective belief that it was the Norridge officers who put him in a wrist lock, but this conclusion is ruled out by the logical implications of his own testimony and the undisputed facts of the case.

Moving to the second relevant time segment—the transfer to the squad car and the ride to the police station—Smith alleges that the Norridge officers used excessive force by failing to loosen his handcuffs. Smith's own response to the Defendants' statement of facts asserts that Officer Pekar did, in fact, loosen Smith's cuffs in response to Smith's first complaint that the cuffs were too tight. (Pl.'s Resp. to Defs.' Stmt. of Facts, ¶ 53.) This occurred before Smith was placed in the squad car. (*Id.*) While in the police car, Smith again complained that his handcuffs were too tight. (Defs.' Stmt. of Facts, ¶ 53.) This time, Officer Urey told him that his cuffs would be removed at the station. (*Id.*) The ride to the station lasted about five minutes. (*Id.*, ¶ 52.) Once Urey and Smith arrived at the station, Smith was placed in a holding cell and his cuffs were removed. (*Id.*, ¶ 53.)

Claims of excessive force in violation of the Fourth Amendment are evaluated under an "objective reasonableness" standard. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). Overly tight handcuffs can be the basis for a valid excessive force claim. *See Tibbs*, 469 F.3d at 666. However, the Seventh Circuit's precedents in this area show that tight handcuffs will rise to the level of "excessive force" only in particularly egregious cases. *See id.* at 666 (summarizing cases). For example, in *Herzog v. Village of Winnetka*, summary judgment on the plaintiff's excessive force claim was inappropriate where the police waited for over an hour to loosen her handcuffs after she complained. 309 F.3d 1041, 1043-44 (7th Cir. 2002). Notably, the tight handcuffs in *Herzog* were not the only basis for the plaintiff's excessive force claim: the police also shoved the plaintiff to the ground, subjected her to blood and urine testing on dubious grounds, and chipped her teeth by jamming a Breathalyzer device into her mouth. *Id.* Similarly, in *Lester v. City of Chicago*, the Seventh Circuit held that a jury could conclude that the police used excessive force where the plaintiff was threatened, kneed in the back, dragged down a hallway, *and* handcuffed to a radiator so tightly that her wrists were bruised. 830 F.2d 706, 714 (7th Cir. 1987).

Smith calls the Court's attention to *Payne v. Pauley*, in which the Seventh Circuit held that a reasonable jury could have found in favor of the plaintiff on a claim of excessive force that was based largely on the tightness of the plaintiff's handcuffs. 337 F.3d at 780. However, the officers in *Payne* "jerked" the plaintiff's arm into handcuffing position, "slammed" the handcuffs down on her wrist, and then refused to loosen the plaintiff's handcuffs even though she complained that

they were so tight that her hands had become numb. *Id.* at 774-75. The plaintiff in *Payne* went immediately to the emergency room and ultimately had multiple operations on her wrists that she claimed were a result of the overly tight handcuffs. *Id.* at 775. In contrast to the plaintiff in *Payne*, Smith did not tell the officers, and does not claim now, that his cuffs were so tight that he could not feel his hands. Tightness that merely leads to discomfort is a far cry from tightness that restricts blood flow and results in a loss of sensation in the extremities. A second distinction is that, by Smith's own admission, Officer Pekar did loosen the cuffs once in response to Smith's first complaint. Smith made his second complaint while he was already being driven to the police station. It was objectively reasonable for Officer Urey to wait until they arrived at the station—after a trip that lasted only five minutes—before he removed Smith's cuffs. Simply put, Smith's allegations regarding his tight handcuffs do not present the severity (e.g., lost sensation in hands, subsequent surgeries) or attenuated suffering (refusal to loosen handcuffs for an hour) present in those cases where the Seventh Circuit has found a question of material fact for the jury. Rather, Smith's experience is most like the "mild allegations" of discomfort that the Seventh Circuit found to be insufficient in *Tibbs*, where the plaintiff was handcuffed for about twenty-five minutes (a longer time period than Smith's ride to the station) and experienced some discomfort and pain without any lasting injury or medical treatment. 469 F.3d at 666.

In light of the foregoing, the Court finds as a matter of law that Smith's allegations of excessive force are insufficient to create a genuine issue of material fact. Because no reasonable jury could find in Smith's favor on his claim that the Defendants used excessive force against him, either by refusing to loosen his handcuffs or by twisting his arms in a "wrist lock," the Defendants are entitled to summary judgment on Smith's claim of excessive force.

### 3. Denial of Medical Care

Smith's final complaint about his treatment at the hands of the Norridge Police Department relates to his requests for medical treatment. While he was being placed into Officer Urey's squad car, Smith complained that he was not feeling well and stated that he wanted medical treatment. (Pl.'s Stmt. of Add'l Facts, ¶ 10.) After making the five-minute drive to the Norridge Police Department, Officer Urey called for paramedics, who arrived shortly thereafter. (Defs.' Resp. to Pl.'s Stmt. of Add'l Facts, ¶ 9.) However, Smith alleges that before the paramedics were called, "Norridge officers threatened [him] with 24 hours in jail if he continued to request medical attention." (Pl.'s Stmt of Add'l Facts, ¶ 9.) When the paramedics arrived, Smith told them that he only wanted them to document a contusion on his arm. (Defs'. Resp. to Pl.'s Stmt. of Add'l Facts, ¶ 9; Defs.' Reply, Ex. A.) Smith denied any shortness of breath or chest pain and refused medical treatment. (*Id.*, ¶ 9; Defs.' Reply, Ex. A.) The paramedics did not observe any physical symptoms other than a contusion on Smith's arm. (Defs.' Reply, Ex. A.) Smith claims that he refused treatment because of the threat that he would have to spend additional time in lockup if he received medical care. Smith argues that, by effectively denying him medical care, the Defendants violated his constitutional rights.

Determining the proper standard for evaluating this claim is somewhat complicated. Although the words "deliberate indifference"—which evoke the familiar standard used in the context of the Eighth Amendment's prohibition of cruel and unusual punishment—appear in some of Smith's pleadings, he cannot make an Eighth Amendment claim because he was not a convicted prisoner at the time of the alleged violation. *See Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) ("[T]he Eighth Amendment only applies to convicted prisoners."). Claims of

inadequate medical care by individuals who are in custody but have not been convicted may be subject to one of two standards. Once a judicial officer has determined that probable cause exists to believe that the detainee has committed a crime, the detainee's conditions of confinement are governed by the Fourteenth Amendment's due process clause, which in turn incorporates the same "deliberate indifference" standard that applies to convicted prisoners. *Williams*, 509 F.3d at 401, 403. Until that point, "the Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made." *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) (internal quote and citation omitted). Under the Fourth Amendment, Smith can prevail if he can show that the Defendants' conduct was "objectively unreasonable" under the circumstances, which is less demanding than the "deliberate indifference" standard. *Id.* at 719.

Four factors are relevant in determining whether the Defendants' conduct in obtaining medical care for Smith was "objectively unreasonable." First, the Court takes into account whether the Defendants had notice of Smith's medical need; second, the Court considers the seriousness of Smith's medical need in light of objective physical symptoms; third, the Court considers the scope of the requested care; and finally, the Court considers the interests of the police, including administrative, penological, and investigatory concerns. *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 4286954, at *7 (N.D. Ill. Sept. 16, 2008) (citing *Williams*, 509 F.3d at 403). Within this framework, the Court finds that there is no basis upon which a reasonable jury could find for Smith. There is no question that Officer Urey was aware of Smith's request for medical help. But there is no evidence that Smith's condition was objectively serious. Although Smith claims that he felt like he was having a heart attack, the paramedics' report

- 19 -

(which Smith signed) states that they observed no shortness of breath or other outward signs of physical distress. (Defs.' Reply, Ex. A.) The report generated by the hospital that Smith visited after his release shows that Smith did not complain of chest pain or shortness of breath, only wrist and back pain. (Pl.'s Stmt. of Add'l Facts, Ex. 18.) Therefore, there is no competent evidence that Smith had an objectively serious medical condition or any suggestion that he actually suffered any harm as a result of a delay in medical treatment.

The paramedics' report also highlights the most crucial flaw in Smith's claim: he was *actually seen* by the paramedics and given the opportunity to receive medical care. The paramedics' report indicates that they arrived at the station and saw Smith at 5:51 p.m., half an hour after he was handcuffed by mall security and twenty-four minutes after Norridge Police were called to the scene. (*See* Defs.' Reply, Ex. A; Harlem-Irving Incident Report, Pl.'s Stmt. of Add'l Facts, Ex. 11; Norridge Police Department Offense Report, Pl's Stmt. of Add'l Facts, Ex. 12.) Taking into account the five-minute drive to the station and the time that was needed to place Smith in the car and gather information about what had happened from mall security, it appears that medical care was provided as soon as possible. Smith's allegations certainly fall short of those that were sufficient to create an issue of material fact in *Petrovic*, where the police refused the plaintiff's requests to be taken to the hospital for at least six hours even though she had visible lacerations on her face and back. 2008 WL 4286954, at *7.

Smith claims that he was, in effect, unreasonably denied care because he lied to the paramedics and refused treatment as a result of the alleged threat that he would have to spend twenty-four hours in jail if he sought medical help. If Smith truly believed that he was having a potentially deadly heart attack and chose to wait until after he was discharged to drive himself to

the hospital in order to avoid a longer stay in the Norridge Police Department lockup, it was he, not the officers, who behaved unreasonably. Furthermore, neither the briefs nor the Court's own research reveal any case holding that an arrestee's constitutional rights are violated when officers make medical care available but make remarks that discourage the arrestee from taking advantage of the care offered. To the contrary, at least one court has held that even threatening to retaliate against an inmate for continuing to seek medical treatment, without actual retaliation, does not constitute a constitutional violation. *See Luis-Ricardo v. Daniels*, No. 06-599 AS, 2006 WL 2934281, at *3 (D. Or. Aug. 17, 2006) (citing *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987), for the proposition that threatening to do a constitutionally prohibited act is not equivalent to doing the act itself). Therefore, even if Smith could show that he had a medical need that was "serious" in light of the observable symptoms, his claim would fail as a matter of law because he was not actually denied access to medical care. Finally, Smith does not allege at any point that he actually suffered harm as a result of any delay in his medical treatment. For all of these reasons, the Defendants are entitled to summary judgment on this claim.

4.      Supervisory/*Monell* Liability

As discussed above, under certain circumstances supervisors can be liable under Section 1983 for constitutional violations in which they were not personally involved, and municipalities may be liable for actions taken by their employees and officers under *Monell*. Of course, there can be no supervisory or *Monell* liability without an underlying deprivation of constitutional rights. *See Houskins v. Sheehan*, 549 F.3d 480, 493-94 (7th Cir. 2008) (in the absence of a constitutional violation, there is no need to consider *Monell* liability or qualified immunity).

Because the Court has found, based on the undisputed material facts of the case, that no deprivation of constitutional rights occurred, Chief Ghiloni is entitled to summary judgment on the issue of supervisory liability, and The Village of Norridge is entitled to summary judgment on Smith's *Monell* claim.

## C.    Smith's State-Law Claims

In addition to his constitutional tort claims under Section 1983, Smith alleges that the Defendants are liable for false arrest, false imprisonment, malicious prosecution, assault, battery, and intentional infliction of emotional distress under Illinois law. The Court addresses these claims in turn.

### 1.    False Arrest/False Imprisonment/Malicious Prosecution

Smith's claims of false arrest, false imprisonment, and malicious prosecution are easily disposed of. Under Illinois law, lack of probable cause is an essential element of all three torts. *See Mannoia v. Farrow*, 476 F.3d 453, 459 (7th Cir. 2007) (citing *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 850 N.E.2d 831, 837 (2006)) (lack of probable cause is an essential element of false arrest and malicious prosecution); *Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 798, 861 N.E.2d 313, 317 (2006) (lack of probable cause is an essential element of false imprisonment claim). As discussed in greater detail above, the arresting officers had probable cause to believe that Smith committed the offense for which he was arrested and charged based on the statements of the mall security guard who witnessed the altercation at Intrigue Jewelers. They had no duty to seek out exculpatory evidence at the time of arrest, and the fact that the ordinance violation was

- 22 -

ultimately dismissed does not negate the existence of probable cause. *See Scruggs v. United States*, 929 F.2d 305, 307 (7th Cir. 1991) (due to different standards of proof, acquittal of criminal charge does not establish lack of probable cause). Because there is no genuine issue that probable cause existed, Smith's state-law claims of false arrest, false imprisonment, and malicious prosecution fail as a matter of law.

2. <u>Assault and Battery</u>

Under Illinois law, battery is defined as "the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity,'" *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (quoting *Cohen v. Smith*, 269 Ill. App. 3d 1087, 648 N.E.2d 329, 332 (1995)), while assault is defined as "conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1. However, Illinois law provides public employees with an additional layer of protection against tort liability by shielding them from liability for actions committed "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The "willful and wanton" requirement may be satisfied by conduct that is performed with an "actual or deliberate intention to harm," an "utter indifference to or conscious disregard for the safety of others," or "reckless disregard for the safety of others." *Chelios*, 520 F.3d at 693 (internal quotes and citations omitted). While the issue of wantonness or willfulness is "normally a question of fact to be determined by the jury," *Chelios*, 520 F.3d at 693 (quoting *Stamat v. Merry*, 78 Ill. App. 3d 445, 397 N.E.2d 141, 145 (1979)), Illinois courts have recognized that the issue may be determined as a matter of law when "no contrary determination . . . could ever stand." *Breck v. Cortez*, 141 Ill. App. 3d 351, 360, 490 N.E.2d 88,

94 (1986). Of course, in federal court, applying federal procedural rules, the issue may be resolved on summary judgment when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

The Court has already found that the Defendants are entitled to summary judgment on Smith's Fourth Amendment-based claims of excessive force and denial of medical care. In making this determination, the Court found that, taking into account the undisputed material facts of the case, there was no genuine issue that the Defendants' actions in arresting and holding Smith were "objectively reasonable" within the meaning of the Fourth Amendment. Because the Defendants' actions were "objectively reasonable" in the Fourth Amendment context, they cannot be considered "willful and wanton," evincing a "deliberate intention to harm" or "reckless disregard for the safety of others." *See DeLuna v. City of Rockford, Illinois*, 447 F.3d 1008, 1013 (7th Cir. 2006) (noting that conduct can be "unreasonable" under the Fourth Amendment without rising to the level of "willful and wanton" and noting "difficulties" with the reverse argument that conduct that is "reasonable" for Fourth Amendment purposes can be willful and wanton under state law). Indeed, Seventh Circuit precedent indicates that the domain of conduct covered by the "willful and wanton" standard set forth in the Illinois statute is narrower than that which would be considered "unreasonable" under the Fourth Amendment, implying that "reasonable" conduct is by definition not "willful and wanton." *See Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998) ("[A]lthough a litigant could soundly argue that willful and wanton conduct should be considered unreasonable, the inverse is not necessarily true. It is entirely possible that unreasonable conduct may not rise to the level of willful and wanton conduct."). Furthermore, as the Seventh Circuit has noted, the Illinois Supreme Court has defined "willful and wanton

misconduct" as that which inflicts a "*highly unreasonable* risk of harm upon others." *Fagocki v. Algonquin/Lake in the Hills Fire Protection Dist.*, 496 F.3d 623, 627 (7th Cir. 2007) (quoting *Burke v. 12 Rothchild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 593 N.E.2d 522, 530-31 (1992)) (emphasis added). Therefore, the Court concludes that reasonableness is not compatible with wantonness and wilfulness: conduct that is reasonable is not "willful and wanton."

Even if it was theoretically possible for conduct to be simultaneously "reasonable" under the Fourth Amendment and "willful and wanton" under Illinois law, Smith has not identified any conduct that would allow a reasonable finder of fact to conclude that any Defendant acted willfully and wantonly to assault or batter him. In his brief in opposition to summary judgment, Smith seems to rest his assault and battery claim on the argument that "while handcuffed, not resisting, and making no attempt to flee, Norridge officers intentionally elicited pain in the form of a 'wrist lock.'" (Smith's Resp. at 17.) However, as discussed in Section II.B.2 above, the undisputed material facts of the case, including Smith's own deposition testimony, indicate that the wrist lock, if it occurred at all, took place while Smith was in the custody of the mall security guards who intially handcuffed him, prior to his transfer to any Norridge police officer. Because there is no basis upon which a reasonable finder of fact could conclude that the Defendants engaged in willful and wanton conduct to assault and batter Smith, the Defendants are entitled to summary judgment on Smith's state-law assault and battery claims.

### 3. Intentional Infliction of Emotional Distress

The same tort immunity that dooms Smith's other state-law claims applies with equal force to his claim for intentional infliction of emotional distress, entitling the Defendants to summary

judgment on this count. Even if there was no immunity, however, Smith's claim would fail on its merits.

In order to prevail on a claim of intentional infliction of emotional distress under Illinois law, a plaintiff must be able to show (1) extreme and outrageous conduct by the defendant; (2) an intent to cause severe emotional distress or knowledge of a high probability of severe emotional distress; and (3) severe emotional distress resulting from the defendant's conduct. *Lopez*, 464 F.3d at 720. The conduct complained of must be "beyond all bounds of decency" such that it is "considered intolerable in a civilized community." *Id.* (internal quotes and citation omitted). Furthermore, as discussed above, Illinois law provides the Defendants with immunity from liability unless their conduct was "willful and wanton" under 745 ILCS 10/2-202.

As discussed in Section II.C.2. above, conduct that passes the Fourth Amendment "reasonableness" test cannot be "willful and wanton" as that term is defined under Illinois law. The same reasoning applies *a fortiori* to the tort of intentional infliction of emotional distress: if conduct is "reasonable," logically it cannot at the same time be so "extreme and outrageous" as to be "atrocious and utterly intolerable in a civilized community." *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744, 761 N.E.2d 175, 186 (2001) (internal quotes and citation omitted). Viewing the facts of the case in the light most favorable to Smith and drawing all reasonable inferences in his favor, the Court finds that no reasonable jury could conclude that the Defendants engaged in extreme and outrageous behavior, or that the Defendants acted with the intent to inflict severe emotional distress or the knowledge that there was a high probability that Smith would suffer severe emotional distress.

The undisputed facts show that neither of the Norridge police officers at the scene used a wrist lock on Smith. Officer Urey's decision not to loosen Smith's handcuffs during the five-minute car ride to the police station was objectively reasonable under the circumstances. And even assuming that a Norridge police officer told Smith he would be detained for twenty-four hours if he sought medical care (which was made available to him, though he refused it), no reasonable fact finder could conclude that this conduct was so abhorrent as to go "beyond all bounds of decency." Therefore, even if the Defendants were not immune under 745 ILCS 10/2-202, their conduct certainly did not rise to the level of "extreme and outrageous," even when all of the facts are viewed in the light most favorable to Smith. Therefore, the Defendants are entitled to summary judgment on Smith's intentional infliction of emotional distress claim.

### 4. Respondeat Superior Liability for State-Law Claims

Because the Defendant officers are entitled to summary judgment on Smith's state-law tort claims, there can be no vicarious liability associated with those claims. Therefore, Chief Ghiloni and The Village of Norridge are entitled to summary judgment on Smith's state-law respondeat superior claims.

### III. Conclusion

The Court finds that there is no genuine issue of material fact and that the Movants, Norridge Police Officers Urey and Pekar, Norridge Police Chief Ghiloni, and The Village of

Norridge, are entitled to judgment as a matter of law as to all of Smith's claims. Therefore, the motion for summary judgment is granted in its entirety, and the case is dismissed with prejudice.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: January 22, 2009.